**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.

RONALD & MARTHA PANZICA, On Behalf of Themselves and All Others Similarly
Situated,

      Plaintiffs,

v.

AGFEED INDUSTRIES, INC.,
GERARD DAIGNAULT,
EDWARD PAZDRO,
SONGYAN LI, and
JUNHONG XIONG,

      Defendants.

---

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
SECURITIES EXCHANGE ACT OF 1934 AND JURY DEMAND**

---

Plaintiffs, on behalf of themselves and the class they seek to represent, make the allegations contained in this Complaint upon information and belief, except as to allegations specifically pertaining to Plaintiffs which are based on personal knowledge. Plaintiffs base their information and belief on the investigation conducted by and under the supervision of their counsel.

## NATURE OF THE ACTION

1.       This is a securities class action brought by Plaintiffs on behalf of all persons who purchased or otherwise acquired the securities of AgFeed Industries, Inc. ("AgFeed" or the "Company") between March 16, 2009 and August 2, 2011, inclusive (the "Class Period"), against AgFeed and certain of its officers and directors for violations of the Securities and Exchange Act of 1934 (the "Exchange Act").

2.       Defendant AgFeed is an international agribusiness that deals in animal nutrition products and commercial hog production in the United States and China. AgFeed's animal nutrition business serves hog producers throughout southeastern China through five feed mills where AgFeed produces additive premix, concentrates, and complete feed. The principal executive offices of AgFeed are located at 744 Horizon Court, Suite 350, Grand Junction, Colorado.

3.       During the Class Period, defendants issued materially false and misleading statements regarding the Company's financial health, especially with regard to its animal nutrition business. As a result of defendants' false statements, AgFeed's stock traded at artificially inflated prices during the Class Period, reaching a Class Period high price of $7.71 per share.

4.       During this time period, AgFeed repeatedly touted its recurring record revenue and operating income. AgFeed also reported large accounts receivable and low allowances for doubtful accounts. AgFeed affirmed the reliability in these reported results by communicating the adequacy

of the Company's internal controls for collecting customer payments and maintaining appropriate reserves for potential bad debts.

5.      As expected, these materially false and misleading statements excited investors and analysts alike, which caused the Company's stock to trade at artificially inflated prices during the Class Period. In turn, analysts at the investment bank of Rodman & Renshaw, LLC ("Rodman & Renshaw") responded to the positive forecasts by reiterating their "Buy" rating and maintaining a rising price target.

6.      Many of AgFeed's customers at the time, however, faced a challenging operating environment and had difficulty meeting their payment terms. AgFeed was aware of this issue and extended the payment terms for its customers. Defendants avoided correctly reporting the Company's bad debt levels by relying on their broad "formula-based analysis." This method of assessing bad debt did not take into consideration the individual characteristics of its struggling customers. The Company's false assessment of its customers' credit risks allowed AgFeed to report artificially high accounts receivable and prolong the Company's denial of its rising bad debts expense. Then on May 10, 2011, AgFeed filed its Form 10-Q with the SEC, announcing that it had replaced its broad "formula-based analysis" with a system that relies on "individual customer assessment."

7.      Transitioning to the "individual customer assessment" method of calculating bad debts forced the defendants to finally reveal the true health of the Company. AgFeed's actual performance in collecting its purportedly recurring record revenue and accounts receivable fell woefully short of defendants' false statements. On August 2, 2011, AgFeed issued a press release announcing disappointing preliminary second quarter fiscal 2011 financial results, as well as some

major surprises in the Company's financial health.  AgFeed disclosed that it expected to post a loss of more than $17 million as it added $5 million in allowances of its bad-debt provision.  AgFeed also stated that it needed to take a $9.2 million charge for the collection of outstanding accounts receivable in its animal nutrition business.  As this news hit the market, shares of AgFeed declined by more than 32% in one day, closing at just $1.34 per share on August 2, 2011.  The ensuing Form 10-Q filed on August 9, 2011 with the SEC further exposed the Company's deficiencies.  In stark contrast to its prior representations less than three months earlier, AgFeed reported significantly reduced accounts receivable and strikingly higher allowances for doubtful accounts.  Furthermore, the release of these disappointing results was accompanied by the Company's announcement that it would withdraw its Registration Statement intended to take part of the Company, AgFeed Animal Nutrition Holdings, Inc., public.  This development caused the Company's stock price to further decline.

8.      The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows: (a) AgFeed's collection efforts and credit dealings with its animal nutrition customers were not working; (b) the "formula-based analysis" the Company relied on in determining accounts receivable and reserves for doubtful accounts did not take into consideration the individual repayment abilities of its struggling customers; (c) the Company's allowances for doubtful accounts were wildly undervalued; (d) AgFeed's accounts receivable were overvalued and bad debts were undervalued, causing reported asset values to be overstated and expenses to be understated; and (e) the Company exaggerated its market edge as the combination of overstated assets and understated expenses resulted in creating an illusion of heightened profitability

and failed to provide a "long-term picture" of AgFeed's value.  As a result, financial guidance was grossly overly-confident, false, and misleading.

9.      As a result of defendants' false statements, AgFeed stock traded at artificially inflated levels during the Class Period. However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down over 72% from their Class Period high.

## JURISDICTION AND VENUE

10.      Jurisdiction is conferred by §27 of the Exchange Act.  The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act.

11.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).

12.      In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

13.      Plaintiffs Ronald & Martha Panzica, as set forth in the accompanying certification which is incorporated by reference herein, purchased common stock of AgFeed at artificially inflated prices during the Class Period and have been damaged thereby.

14.      Defendant AgFeed is a Nevada corporation that engages in the animal nutrition premix, concentrate, and complete feeds business and commercial hog production business in the United States and China through its three principal operating units: Animal Nutrition, Hog

Production, and Harvesting.  AgFeed's animal nutrition business serves hog producers throughout southeastern China through five feed mills where AgFeed produces additive premix, concentrates, and complete feed.    AgFeed has exclusive distribution arrangements with nearly 1,400 independently owned retail stores and serves over 780 commercial farms.  The principal executive offices of AgFeed are located in Grand Junction, Colorado.

15.     AgFeed entered the hog breeding and production business in China in November 2007.  In this business, the Company mainly produces hogs for processing and sells breeding stock. AgFeed entered the hog breeding and production business in the United States in September 2010, with the acquisition of M2P2, LLC.

16.     Defendant Gerard Daignault ("Daignault") is AgFeed's Chief Operating Officer ("COO") and has been since August 2008.  Daignault is also President and Chief Executive Officer ("CEO") of AgFeed's animal nutrition business and has been since at least November 2010.

17.     Defendant Edward Pazdro ("Pazdro") is AgFeed's Chief Financial Officer ("CFO") and has been since February 2011.  Pazdro is also CFO of AgFeed International Protein Technology Corp., a joint venture focusing on enhancing hog production systems for Chinese and other Pan Asian clients, and the hog division of AgFeed.  Pazdro was AgFeed's Acting CFO from November 2010 to February 2011.

18.     Defendant Songyan Li ("Li") was AgFeed's Executive Chairman and Chairman of the Board of Directors (the "Board") from December 2006 to February 2011 and a director from October 2006 to February 2011.  Li was also AgFeed's Chief Technology Officer from April 2009 to at least August 2010.  Following his departure as Executive Chairman and Chairman of the Board, Li remained with AgFeed as Vice Chairman of the Company's hog production business.

19.     Defendant Junhong Xiong ("Xiong") was AgFeed's CEO and a director from November 2006 to February 2011.  Xiong also held various other positions at AgFeed between November 2006 and February 2011, including Vice Chairman and President.  Following his departure as CEO, Xiong remained with the Company as Chairman of the animal nutrition business.

20.     The defendants named in ¶¶14-19 are sometimes collectively referred to herein as the "Defendants."  The defendants named above in ¶¶16-19 are sometimes collectively referred to herein as the "Individual Defendants."

21.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of AgFeed's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material, non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the  false statements pleaded herein.

## CLASS ACTION ALLEGATIONS

22.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who purchased or otherwise acquired the securities of AgFeed between March 16, 2009 and August 2, 2011, inclusive

(the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

23.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, AgFeed common stock was actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by AgFeed or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

24.      Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

25.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

26.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions are:

(a)     whether the Exchange Act was violated by Defendants as alleged herein;

(b)     whether statements made by Defendants misrepresented material facts about the business, operations and management of AgFeed; and

(c)      to what extent the members of the Class have sustained damages and the proper measure of damages.

27.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

28.      On March 16, 2009, AgFeed filed its Form 10-K with the SEC touting the Company's internal controls for maintaining appropriate reserves for potential bad debts.  The Form 10-K stated in part:

> The Company maintains reserves for potential credit losses on accounts receivable. ***Management reviews the composition of accounts receivable and analyzes historical bad debts, customer concentrations, customer credit worthiness, current economic trends and changes in customer payment patterns to evaluate the adequacy of these reserves.***

29.      On March 16, 2009, AgFeed issued a press release announcing "record financial results" for the year of 2008.  AgFeed credited "long term annual supply agreements" with its customers as one of the factors driving heightened earnings.  The release stated in part:

> AgFeed reported premix and blended feed related income from operations of $7.78 million on revenue of $51.75 million and net income on hog sales of $16.92 million on hog sales of $91.92 million, prior to the cost of the holding company of $6.66 million. These results reflected 23.97% gross profit margin for the company. ***Premix and blended feed earnings were driven by efficient cost management, increased economies of scale on raw material purchases, and long term annual supply agreements.*** AgFeed's income from hog operations was driven by the phasing-in of 30 producing hog farms starting in late 2007.

30.     On May 11, 2009, AgFeed filed its Form 10-Q with the SEC describing the Company's procedures for accounting for doubtful accounts.  In addition, the Company reported $11.9 million in accounts receivable, net of a $282,958 allowance for doubtful accounts as of March 31, 2009. The Form 10-Q stated in part:

> **We continually monitor customer payments and maintain a reserve for estimated losses resulting from our customers' inability to make required payments**. In determining the reserve, we evaluate the collectability of our accounts receivable based upon a variety of factors. **In cases where we become aware of circumstances that may impair a specific customer's ability to meet its financial obligations, we record a specific allowance against amounts due.** For all other customers, we recognize allowances for doubtful accounts based on our historical write-off experience in conjunction with the length of time the receivables are past due, customer credit worthiness, geographic risk and the current business environment.

31.     On August 10, 2009, AgFeed filed its Form 10-Q with the SEC which included several consolidated balance sheets.  One balance sheet stated that the Company had $14.6 million in accounts receivable, net of a mere $69,660 allowance for doubtful accounts as of June 30, 2009.

32.     On August 11, 2009, AgFeed issued a press release announcing its second quarter 2009 financial results, touting its accomplishments in meeting projections and setting expectations of successful future prospects.  The release stated in part:

> In discussing AgFeed's animal nutrients business, Junhong Xiong, AgFeed's Chief Executive Officer, provided "our revenues in this business were $11.1 million in the second quarter and $21.2 million for the first six months of 2009. Our premix, condensed, complete and fine feed sales totaled 43,500 metric tons for six months. **We were able to meet our earlier projections in this business in spite of the down hog market and we are poised to meet our goal of 100,000 metric tons to be sold in 2009.** We also added significant numbers to our distribution network, including more than 200 independently owned, AgFeed-exclusive feed distribution chain stores and over 100 large-size commercial hog farms to our network in the last six months for totals of 1,239 stores and 712 farms, respectively. **We believe that all of these signs are indicative of an increasing recognition of our brand and the quality of our 'green-certified' feed products and signal a rise in both production and sales going forward. "**

33.     November 10, 2009, AgFeed issued a press release announcing its third quarter 2009

financial results, touting a "strong balance sheet" and promising extraordinary growth in its animal

nutrition business. The release stated in part:

> Dr. Songyan Li, AgFeed's Chairman, commented that, "I am pleased to report that
> nine months into our transition year we are accomplishing much of what we set out
> to do. I am happy with the operating results in both of our business segments in spite
> of a number of market challenges that we faced in the hog industry and in our
> regional economy. Our operating income for the third quarter was a commendable
> $3.71 million. We finished the quarter with a ***strong balance sheet*** and $36.5 million
> in cash to fund our operations and growth. ***Our animal nutrients business performed***
> ***exceptionally well in the third quarter***, aided by the recent implementation of the
> Food Safety Laws and the Green-Certified label on our products."
>
> * * *
>
> In discussing AgFeed's animal nutrients business, Junhong Xiong, AgFeed's Chief
> Executive Officer, asserted, "Our revenues of $17.1 million in the third quarter of
> 2009 were significantly higher, reaching approximately 80% of the revenues we
> posted for the first half of 2009. ***We expect that our animal nutrients business***
> ***segment will remain strong through the end of 2009, meeting and exceeding our***
> ***projections of 100,000 metric tons sold in 2009."*** Mr. Xiong added, "AgFeed is
> responding to the market demand for "complete" feed with plans to upgrade and
> expand our production capabilities in this key market segment. We believe this will
> provide an opportunity for us to ***triple our animal nutrient business revenues by the***
> ***end of 2011."***

34.     On March 8, 2010, AgFeed filed its Form 10-K with the SEC which included several

consolidated financial statements.  In this Form 10-K, AgFeed reported a mere $196,005 in bad debt

expense for the year of 2009.

35.     On March 9, 2010, AgFeed issued a press release announcing record revenues for

2009.  The release stated in part:

> AgFeed Industries, Inc., one of the largest independent hog production and animal
> nutrient companies in China, today announced ***record levels of revenue in both of its***
> ***operating units: hog production and animal nutrition***. Production volumes
> increased by 66% in the company's hog division and 56% in the animal nutrition
> division.

36.     Rodman & Renshaw responded to these positive forecasts by reaffirming its "Buy" ratings.  Rodman & Renshaw had a price target of $7 per AgFeed share between mid-August 2009 and mid-April 2010.

37.     On May 10, 2010, AgFeed filed its Form 10-Q with the SEC which included several consolidated balance sheets.  One balance sheet stated that the Company now had $22.9 million in accounts receivable, net of a mere $498,612 allowance for doubtful accounts as of March 31, 2010. The doubtful accounts allowance increased only 20% over what the Company set for the entire year of 2009, which had 60% less accounts receivable.  AgFeed presented these figures in the same filing as it touted the Company's internal controls for accounting for doubtful accounts.  The Form 10-Q stated in part:

> ***We continually monitor customer payments and maintain a reserve for estimated losses resulting from our customers' inability to make required payments***. In determining the reserve, we evaluate the collectability of our accounts receivable based upon a variety of factors. ***In cases where we become aware of circumstances that may impair a specific customer's ability to meet its financial obligations, we record a specific allowance against amounts due.*** For all other customers, we recognize allowances for doubtful accounts based on our historical write-off experience in conjunction with the length of time the receivables are past due, customer credit worthiness, geographic risk and the current business environment.

38.     On May 11, 2010, AgFeed issued a press release announcing its first quarter 2010 financial results, touting increased revenues.  Defendant Xiong, AgFeed's President, noted that many animal nutrition customers were struggling so the Company decided to extend their payment terms. Xiong also stated that the Company was able to accommodate its "credit worthy customers" and "sell hogs at relatively advantageous prices."  Thus, the financial results that AgFeed was communicating to the market included accounts receivable from these "struggling," yet purportedly "credit worthy customers."  The release stated in part:

AgFeed Industries, Inc., one of the largest independent hog production and animal nutrient companies in China, today announced its results for the first quarter of 2010. Revenue for the first quarter reached $52.9 million an increase of 58% compared to the first quarter of 2009. Production volumes increased by 24% in the Company's hog division and 119% in the animal nutrition division, as compared to the same period in 2009.

\* \* \*

Mr. Junhong Xiong AgFeed's President observed, "We are pleased with the results we achieved in a challenging operating environment. During the quarter, the average hog price was 11% less than the first quarter of last year. ***Many of our customers are struggling to withstand the combined challenge of low hog prices and increased feed prices due to the high cost of corn. In order to support our animal nutrition customers and cement our market position, AgFeed has chosen to exploit its relative financial strength by extending payment terms to its customers. Facing similar pressures in our Hog Division, we were able to sell hogs at relatively advantageous prices by accepting payment terms from certain longstanding and credit worthy customers."***

39.     On August 10, 2010, AgFeed issued a press release announcing its first half of 2010 financial results, once again publicizing increased revenues, even in "an extremely difficult operating environment."  During the second quarter the Company faced a series of severe floods throughout its area of operations.  Defendant Daignault, AgFeed's COO, stressed that AgFeed could no longer continue to extend payment terms to its struggling customers.  Although the amount of accounts receivable declined during the quarter and reflected this sentiment, the true state of the Company and its dealing with its customers was not fully disclosed to its investors.  A majority of the Company's bad debts were still unaccounted for.  The release stated in part:

Mr. Gerry Daignault, AgFeed's COO emphasized, "***While AgFeed has supported its customers with extended payment terms from time to time, in light of the industry wide operating pressures we limited this practice during the quarter and reduced accounts receivable by over $5.6 million from March 31st.*** We also reduced our payables by approximately $3.4 million while also continuing our capital investment program to support of expansion in an amount over $3.3 million."

40.     On October 11, 2010, AgFeed issued a press release announcing the filing of a Registration Statement for an Initial Public Offering of shares in its subsidiary AgFeed Animal

Nutrition Holdings, Inc.  Defendant Li touted the value and benefits that AgFeed shareholders would

reap from this public offering.  The release stated in part:

> Dr. Songyan Li, AgFeed's Chairman, stated, "We believe that **the carve out of AANI will be a positive development for our shareholders** and for the business prospects of AANI. Establishing a public market for AANI will provide an independent valuation of one of our business units that we feel has been overlooked by the market, thus **unlocking value for AgFeed's shareholders**. As a public company in its own right, AANI will have a sharp strategic focus and will have independent access to both debt and equity capital to support its pursuit of a myriad of growth opportunities."

41.     On November 9, 2010, AgFeed filed its Form 10-Q with the SEC once again touting

the Company's internal controls for maintaining appropriate reserves for potential bad debts.  The

Form 10-Q stated in part:

> The Company maintains reserves for potential credit losses on accounts receivable. ***Management reviews the composition of accounts receivable and analyzes historical bad debts, customer concentrations, customer credit worthiness, current economic trends and changes in customer payment patterns to evaluate the adequacy of these reserves.***

42.     That same day, AgFeed issued a press release announcing its third quarter 2010

financial results, touting recurring record revenue and operating income.  The release stated in part:

> ***AgFeed reports continued record results in its animal nutrition business segment with revenue and operating income increasing 59% and 37% respectively for the first three quarters of 2010 as compared to the same period in 2009 and achieving new record levels.*** AgFeed's U.S. hog production system, which commenced through its acquisition of M2P2 late in the third quarter generated results in line with the Company's plans.

43.     Rodman & Renshaw responded to these positive reported results by reaffirming its

"Buy" ratings.  Rodman & Renshaw had a price target of $6 per AgFeed share between mid-

November 2010 and mid-February 2011.

44.     On March 16, 2011, AgFeed filed its Form 10-K with the SEC once again touting the

Company's internal controls for accounting for doubtful accounts.  The Form 10-K stated in part:

> *We continually monitor customer payments and maintain a reserve for estimated losses resulting from our customers' inability to make required payments.* In determining the reserve, we evaluate the collectability of our accounts receivable based upon a variety of factors. *In cases where we become aware of circumstances that may impair a specific customer's ability to meet its financial obligations, we record a specific allowance against amounts due.* For all other customers, we recognize allowances for doubtful accounts based on our historical write-off experience in conjunction with the length of time the receivables are past due, customer credit worthiness, geographic risk and the current business environment.

45.     On March 17, 2011, AgFeed issued a press release announcing its 2010 financial

results, touting record-setting revenues and reinforcing the accuracy of the Company's financial

statements, especially in regards to reported "asset values."  The release stated in part:

> AgFeed Industries, Inc., an international agribusiness company with operations in the U.S. and China and one of the large independent hog producers and manufacturers of animal nutrients in China *announced record levels of revenue in both its animal nutrition and U.S. hog production units for the fourth quarter of 2010 and for the full year 2010. The Company's 2010 fourth quarter and year-end revenues were the highest in company history representing an increase over revenues for the same periods in 2009 of 77.2% and 40.7%, respectively*.
>
> * * *
>
> The Company's Chief Financial Officer, Edward Pazdro, said, "We have worked closely with outside consultants, auditors and our new management team to thoroughly assess the long-term viability and profitability of our legacy Chinese hog farms, and based on current market conditions, *believe that our asset values are appropriate and present a long-term picture of the value of our legacy farms."* Mr. Pazdro stated further, "The combination of M2P2's operating discipline with our management information systems will allow us to monitor and execute our strategic plan."

46.     On May 10, 2011, AgFeed filed its Form 10-Q with the SEC which included several

consolidated balance sheets.  One balance sheet stated that the Company had $28.6 million in

accounts receivable, net of a $1.9 million allowance for doubtful accounts as of March 31, 2011.

47.     In that same Form 10-Q, AgFeed once again touted the Company's internal controls for maintaining appropriate reserves for potential bad debts.  Furthermore, the Company noted an adjustment it made to its normal protocol for assessing bad debt.  All of a sudden, the Company replaced its broad "formula-based analysis" and started relying instead on an "individual customer assessment."  The 10-Q stated in part:

> Accounts receivable are carried at original invoice less an estimate for doubtful accounts. Management reviews the composition of accounts receivable and analyzes historical bad debts, customer concentrations, customer credit worthiness, current economic trends and changes in customer payment patterns to evaluate the adequacy of these reserves. Accounts receivable are written off when deemed uncollectible. Recoveries of trade receivables previously written off are recorded when received.

> ***The Company's accounts receivable and reserves for doubtful accounts are substantially representative of its credit dealings with animal nutrition customers.*** The Company ages its receivables into traditional 30-day buckets and monitors the customers and balances on a regular basis. ***Generally the Company uses a formula-based analysis to more broadly assign collection risk to its aging groups primarily over 90 days past due, subject to specific customer review.*** This formula-based approach applies a declining percentage of collectability to each bucket-aging category at least 90 days past due as the past due days increase. ***For the current quarter, however, the Company placed greater reliance on individual customer assessment and then applied an overall factor of collection as its believes the Company is experiencing a new set of market dynamics exacerbated by the reorganization of its animal feed nutrition segment, cash constraints of its long-standing customers related to increasing feed raw material costs and herd expansion initiatives.***

### THE TRUTH MAKES ITS WAY INTO THE MARKET

48.     On August 2, 2011, AgFeed issued a press release announcing disappointing preliminary second quarter fiscal 2011 financial results, as well as some major surprises in the Company's financial health.  AgFeed disclosed that it expected to post a loss of more than $17 million as it added $5 million in allowances to its bad-debt provision.  AgFeed stated that it would

take a charge of $9.2 million for the collection of outstanding accounts receivable in its animal-nutrition business.  The release stated in part:

> For the second quarter of 2011, the Company expects to report revenues of approximately $84.0 million and a net loss of approximately $17 million for the three months ended June 30, 2011. This loss includes an expense of $9.2 million related to the collection of outstanding accounts receivable in the Company's Chinese animal nutrition business and an additional $5.0 million of bad debt allowance to increase its bad debt provision from $1.9 million to $7.0 million. Accordingly, we expect accounts receivable to decrease by approximately $14.2 million. The operating pressures facing the Company's customers has led management and the board to be aggressive in establishing reserves due to concerns regarding credit quality. The Company's leadership remains committed to pursuing every available remedy to collect all amounts due.

49.     As news began to leak into the market on August 2, 2011, AgFeed's shares sank from $1.99 to a closing price of $1.34 at the end of the day on August 2, 2011.  This represented a one-day decline of over 32%.

50.     On August 9, 2011, AgFeed filed its Form 10-Q with the SEC which included several consolidated balance sheets.  One balance sheet stated that the Company only had $13.2 million in accounts receivable, net of a $7 million allowance for doubtful accounts as of June 30, 2011.  These figures were in stark contrast to AgFeed's May 10, 2011 Form 10-Q in which the Company reported $28.6 million in accounts receivable, net of a mere $1.9 million allowance for doubtful accounts as of March 31, 2011.

51.     On that same day, AgFeed sent a letter to the SEC announcing that it would withdraw its Registration Statement, that intended to take part of the Company, AgFeed Animal Nutrition Holdings, Inc., public.  As this news leaked into the market, AgFeed's shares continued to plummet.

52.     On September 29, 2011, the Company issued a press release announcing that its Board had established a special committee to conduct an investigation into the accounting practices of its Chinese operations.  The release stated in part:

> AgFeed Industries, Inc. announced today that its Board of Directors has established a special committee to investigate the accounting relating to certain of the Company's Chinese farm assets (acquired during 2007 and 2008) used in its hog production business, as well as the validity and collectability of certain of the Company's accounts receivables relating to its animal nutrition business in China and any other issues that may arise during the course of the investigation.

53.     The day after this news was released, AgFeed stock further plummeted, closing at $0.52 on September 30, 2011.  This was a 73% decline from its $1.99 price per share that existed just two months earlier, before the truth about AgFeed's financial health leaked into the market.

54.     AgFeed's deteriorating accounting practices and incomplete filings forced the NASDAQ to temporarily halt all trading of AgFeed stock on October 3, 2011.  NASDAQ would not resume trading in AgFeed stock until it received "additional information" from the Company.

55.     The true facts, which were known by the Defendants but concealed from the investing public during the Class Period, were as follows: (a) AgFeed's collection efforts and credit dealings with its animal nutrition customers were not working. The "formula-based analysis" the Company relied on in determining accounts receivable and reserves for doubtful accounts did not take into consideration the individual repayment abilities of its struggling customers; (b) allowances for doubtful accounts were wildly undervalued; (c) accounts receivable were overvalued and bad debts were undervalued, causing reported asset values to be overstated and expenses to be understated; and (d) the Company overstated its market edge as the combination of overstated assets and understated expenses resulted in creating an illusion of heightened profitability and failed to provide a "long-

term picture" of AgFeed's value.  As a result, financial guidance was grossly overly-confident, false, and misleading.

56.     Due to Defendants' false statements, AgFeed's stock traded at artificially inflated levels during the Class Period.  However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down over 72% from their Class Period high.  AgFeed stock closed at $0.40 on October 3, 2011.  This was a 91% decline from the Class Period high.

## NO SAFE HARBOR

57.     AgFeed's "Safe Harbor" warnings accompanying its forward-looking statements ("FLS") issued during the Class Period, if any, were ineffective to shield those statements from liability.  To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with GAAP, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor.  15 U.S.C. §78u-5(b)(2)(A).

58.     Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of AgFeed who knew that the FLS was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## APPLICATION OF PRESUMPTION OF RELIANCE
## FRAUD ON THE MARKET

59.     Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: Defendants made public misrepresentations or failed to disclose material facts during the Class Period; the omissions and misrepresentations were material; the Company's stock traded in an efficient market; the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and Plaintiffs and other members of the Class purchased AgFeed common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

60.     At all relevant times, the market for AgFeed common stock was efficient for the following reasons, among others: as a regulated issuer, AgFeed filed periodic public reports with the SEC; and AgFeed regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## LOSS CAUSATION / ECONOMIC LOSS

61.     During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of AgFeed common stock and operated as a fraud or deceit on Class Period purchasers of AgFeed stock by misrepresenting the value of the Company's business and prospects by overstating its assets.   As Defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of AgFeed common stock fell precipitously, as the prior artificial

inflation came out of the price over time.  As a result of their purchases of AgFeed stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

### COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

62.     Plaintiffs repeat and reallege each allegation contained above as if fully set forth herein.  This claim is asserted against all Defendants.

63.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

64.     Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of AgFeed common stock during the Class Period.

65.     Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for AgFeed common stock.  Plaintiffs and the Class would not have purchased AgFeed common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### <u>Against the Individual Defendants</u>

66.     Plaintiffs repeat and reallege each allegation contained above as if fully set forth herein.  This claim is asserted against the Individual Defendants.

67.     The Individual Defendants acted as controlling persons of AgFeed within the meaning of §20(a) of the Exchange Act.  By reason of their positions with the Company, the Individual Defendants had the power and authority to cause AgFeed to engage in the wrongful conduct complained of herein.   By reason of such conduct, these defendants are liable pursuant to §20(a) of the Exchange Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.     Determining that this action is a proper class action and certifying Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiffs and the other Class members against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.     Awarding rescission or a rescissory measure of damages; and

E.     Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

DATED:  October 25, 2011                    Respectfully submitted,


                                         *s/ Jeffrey A. Berens*
                                        Robert J. Dyer III
                                        Jeffrey A. Berens
                                        Darby K. Kennedy
                                        **DYER & BERENS LLP**
                                        303 East 17th Avenue, Suite 300
                                        Denver, CO  80203
                                        Telephone: (303) 861-1764
                                        FAX: (303) 395-0393
                                        Email: bob@dyerberens.com
                                        Email: jeff@dyerberens.com
                                        Email: darby@dyerberens.com

                                        Michael I. Fistel, Jr.
                                        **HOLZER, HOLZER & FISTEL, LLC**
                                        200 Ashford Center North, Suite 300
                                        Atlanta, Georgia 30338
                                        Telephone: (770) 392-0090
                                        FAX:  (770) 392-0029
                                        Email: mfistel@holzerlaw.com

                                        *Attorneys for Plaintiffs*

## CERTIFICATION OF PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

The undersigned declare, as to the claims asserted under the federal securities laws, that:

1. The undersigned have reviewed the complaint and approves its filing.

2. The undersigned did not purchase the security that is the subject of this action at the direction of counsel or in order to participate in this lawsuit.

3. The undersigned are willing to serve as representative parties on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. The undersigned's purchases and sales of AgFeed Industries, Inc. (NASDAQ: FEED) common stock during the class period are as follows: *See attached schedule.*

5. During the three years prior to the date of this certificate, the undersigned have sought to serve or served as representative parties for a class in the following actions under the federal securities laws (if any):

6. The undersigned will not accept any payment for serving as representative parties on behalf of the class beyond the undersigned's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

We declare under penalty of perjury that the foregoing is true and correct. Executed on: **OcTobeR  2S**, 2011.

_____
Ronald Panzica

_____
Martha Panzica

Schedule of AgFeed Industries, Inc. (NASDAQ: FEED)
Common Stock Transactions During the Class Period
Ronald & Martha Panzica

| Transaction Date | # of Shares | Buy or Sell | Price/Share |
|---|---|---|---|
| 8 · 01 - 2011 | 14,000 | # 2.04 | 2.04 |
| 5 · 02 · 11 | 1,100 | # 1.65 | 1.65 |